STATE OF MAINE vs. HENRY LAMBERT.

Piscataquis.   Opinion December 6, 1902.

*Murder.   Jury.   Appeal.   Evidence.*

In determining an appeal of one convicted of murder, the single question presented is whether, in view of all the testimony in the case the jury were warranted in believing beyond a reasonable doubt, and therefore in finding, that the defendant was guilty of the crime charged against him.

The jury must be the final arbiters of questions of fact, when the evidence in support of their conclusion, considered in connection with all the other evidence is of such a character, such a quality and such weight as to warrant them in believing it.

While evidence of single circumstances standing alone might not be sufficient to warrant the conviction of one accused of crime, the combined force of many concomitant and interlacing circumstances each insufficient in itself, may lead a reasoning mind irresistibly to a conclusion of guilt.

*Held;* that the verdict of the jury sustaining the defendant's guilt was well warranted by the evidence.

On appeal by defendant.   Appeal denied.   Judgment for the State.

The defendant was convicted by a jury in Piscataquis County for the murder in the first degree of J. Wesley Allen of Shirley.   He made a motion in the court below to have the verdict set aside.   This motion having been overruled, he appealed to this court.

The case appears fully in the opinion.

*Geo. M. Seiders*, Attorney General, *M. L. Durgin*, County Attorney, with him, for State.

*Henry Hudson*, for defendant.

SITTING:   WISWELL, C. J., WHITEHOUSE, SAVAGE, POWERS, PEABODY, SPEAR, JJ.

SAVAGE, J.   The evidence is plenary, and it is not now controverted, that in the evening or night of Sunday, May 12, 1901, J. Wesley Allen of Shirley, his wife, and their daughter Carrie, were

murdered, and that the farm buildings of Allen in Shirley, house, ell, shed and barn, were burned to destroy the evidences of the crime. The defendant was indicted for the murder of J. Wesley Allen. As the result of a lengthy trial in which all of his rights seem to have been carefully protected by the presiding justice, he was convicted of murder in the first degree. His motion to set aside the verdict was overruled and he has appealed from that decision to this court. No exceptions have been reserved, and the single question presented for our consideration is whether in view of all the testimony in the case, the jury were warranted in believing beyond a reasonable doubt, and therefore in finding, that the defendant was guilty of the crime charged against him. We have examined the voluminous record with great care and solicitude. The evidence relied upon by the State to support the conviction is almost wholly circumstantial, and as to the existence of many of the circumstances relied upon there is a sharp conflict of testimony. We may say at the outset that in considering the weight of this testimony, depending as it does for its effect upon the credibility of the witnesses, we cannot put ourselves in the place of the jury, nor usurp that province of deciding questions of fact which the law imposed upon them. Their conclusions, if warranted by the evidence, are to stand. We have before us only the pages of a printed record, aided somewhat by an inspection of the exhibits which were introduced in evidence at the trial. The jury had before them the living, speaking witnesses. The degree of credence properly to be given to the story of a witness may depend much upon his appearance upon the stand, upon his air of candor and truthfulness, upon his seeming intelligence and honesty, upon his apparent want of bias or interest or prejudice. The want of such characteristics may render testimony of little value. And the appearance of such characteristics, or the want of them, is not always transcribed upon the record of a case. If the story of a witness is seemingly credible and probable, and not inconsistent with other admitted or proven facts, the listener has much better opportunity to judge correctly of its truthfulness than a reader has. From the bare record we might be in grave doubt as to which of two conflicting statements is true. The jury, seeing the witnesses, might

have no reasonable doubt.   And it follows that in cases like the one under consideration, as in all others, the jury must be the final arbiters of questions of fact, when the evidence in support of their conclusions, considered in connection with all the other evidence, is of such a character, such a quality and such weight, as to warrant them in believing it.   We shall endeavor to apply these principles in our consideration of this case.

The State claims that the defendant, who had spent all day Saturday, May 11, and the greater part of Sunday, May 12, at West Cove in Greenville, left West Cove Sunday afterooon about four o'clock; that he had on his feet a pair of new rubbers, No. 6 1-2, Bay State, which he had purchased the previous Friday evening, and in his hand an umbrella, which he used as a cane; and that he had in his pocket a quart bottle nearly or quite full of whiskey.   The State further claims that he proceeded southward by the track of the Bangor & Aroostook Railroad to the "Bully road" so-called.   The Bully road is an old unused logging road or path, leading across from the railroad to the Shirley Mills road, and the latter road leads to the main traveled road from Greenville to Blanchard called the Lake road.   The Bully road proceeds for the most part through a woody growth on either hand.   It is claimed that he walked through the Bully road to the Shirley Mills road, along the Shirley Mills road towards the Lake road, and then down the Lake road to a point about a mile and a half north of the Allen place, where he left the Lake road and walked along another old unused logging road, called the "Spencer road", to the immediate vicinity of the Allen house; and that he went to a small wooden structure, situated thirty-four rods from the Allen place, which he had formerly owned, but which he had recently sold with its contents to one Elmer Huff, with the privilege of occupying it from time to time, by first obtaining the key from Huff.   That structure was called "Lambert's camp."   The State claims that the defendant, while in the camp, left the umbrella with which he started, and what remained of a box of "blazer" or "safety" matches which he had purchased in West Cove that day.   It is further claimed that he then went to the Allen buildings, murdered Allen and his wife and daughter, and fired the

buildings; that he walked back to the house of Telos Smith, which is situated on the Lake road somewhat northerly of the Shirley Mills road; that he arrived there sometime during the night; that when he arrived the bottoms of his trousers' legs and his stockings were muddy; that he had the appearance of having walked very fast; and that some of the whiskey was gone from the bottle. The distance from West Cove to the Allen place by the route which it is claimed that the defendant walked is a little more than nine and two-thirds miles, and from the Allen place back to Telos Smith's house, three miles. It seems to be satisfactorily proved that the fire at the Allen place occurred, or was first observable, between the hours of nine and ten that night, probably nearer nine than ten. Upon the theory of the State it is evident that the distance from West Cove to Allen's did not preclude opportunity.

The State contends that the motive for the crime, or to speak more exactly, the motive which led the defendant to the Allen house on the night in question, was not ill-will, for none has been shown, nor robbery or burglary, for there is no evidence of any theft, but that it was lust for Carrie Allen, who, though only a little more than fourteen years old, was a large and fleshy girl. It is claimed that on previous occasions he had expressed lascivious desires concerning this girl, his expressions looking even to the putting of "the old folks out of the way," if necessary. The State's theory is that he accomplished his purpose by violence, and that he took Allen's life either before-hand to prevent interference with the intended rape, or afterwards in some altercation which resulted from it. In support of this contention the State relies much upon the fact that when the defendant's trunk was searched after his arrest, the white shirt which he admittedly wore that Sunday night was found, and when found, a rectangular piece seven or eight inches across had been cut out of the lower end of the front flap. The defendant, however, says that he cut the piece out of the shirt at another place and for another purpose, to be noted hereafter, and says that he left the piece somewhere about his room at Telos Smith's. This piece though searched for was never discovered. One witness testified that on the day succeeding the fire, at the premises, the defendant told him that "he

(the defendant) came pretty near being in the house," "that he started for Allen's place" when he left Greenville. The evidence indicates that the fatal wounds were inflicted upon Allen about twenty-five feet from his barn, where two large blood spots were found upon the ground, and that the body was then removed, but not dragged, to within the barn, where his remains were afterwards found in the ruins.

The defendant's version of his whereabouts on that Sunday evening is substantially as follows: He says he left West Cove between five and six o'clock, nearer six than five, and that he had no rubbers on, nor umbrella with him. He says that he left the rubbers which he bought Friday night in the office of the Bartley House at West Cove Saturday morning, together with an umbrella which he had borrowed from Telos Smith Friday night, and that he never used nor saw either the rubbers or the umbrella afterwards. He denies that he purchased any "blazer" matches at West Cove that day, or that he had ever used or had the possession of any such matches. He claims that he had on his feet only his stockings and a pair of thin, low shoes, with patent leather toes and patent leather up the front. He says that he walked from West Cove by the track of the Canadian Pacific Railway to the Lake road at King's Crossing, a mile and two-thirds, then down the road a little over two miles to a point near the house of Charles Roberts, where there was a spring six or eight rods from the road; that he reached that point about seven o'clock; that he went to the spring and drank from it; and that the spring was an open one, with the water bubbling up. He says that his left foot hurt him in consequence of his boots being tight; that he took off his shoe and stocking and bathed his foot which was sore and blistered; that he cut the missing piece out of the front flap of his shirt with his knife, and used it to wrap between his toes, so as to make walking less uncomfortable; that he then put on his stocking and shoe over the piece of cloth, and walked southerly through a pine growth forty-five or fifty rods until he came to the Lake road again, traveling about ten rods from the road; that he walked down the road to the Mansell line, and then crossed the road and walked in the pasture beside the road for about one hundred rods, that he

then came into the road again and walked to Telos Smith's, where he arrived at a little past eight o'clock; that he went immediately to bed, and it would seem, supperless; and that he was not out of the house or his room again that night.   He says he is able to fix the time of his arrival at Telos Smith's, because he noticed his watch when he got up to wind it, after having gone to bed.   He says he walked in the pine woods and in the pasture on account of the muddy condition of the road.   The distance from West Cove to Telos Smith's house by the route the defendant says he travelled is six miles and two-thirds, and from Smith's to the Allen place is three miles.   It is evident that if the defendant's statement is true, he had no opportunity to commit the crime charged.

To connect the defendant with the crime, the State seeks first to show that he was in the vicinity of the Allen place Sunday night, and to show this, testimony was introduced that he left West Cove at about four o'clock in the afternoon, walking upon the railroad in the direction of Shirley with rubbers and umbrella.   In addition to this the State relies chiefly upon the following circumstances:

1.   That fresh rubber tracks in the mud were found Monday morning between the Allen house and the "camp," and later in the week in the Bully road and the Spencer road, which tracks were made by the defendant's new rubbers.

2.   That an umbrella found in the camp Monday afternoon had been in the defendant's possession at West Cove Sunday afternoon.

3.   That "blazer" or "safety" matches were found in the camp Monday forenoon of the same kind that the defendant had purchased in West Cove Sunday forenoon.

4.   That human blood was found on the defendant's clothing.

While it is not disputed that rubber tracks were found at the times and in the places claimed, and that an umbrella and "blazer" matches were found in his camp Monday, it should be remembered that the defendant denies that he wore any rubbers at all Sunday night, and says that he had no rubbers or umbrella in his possession at West Cove after Saturday morning, and that he did not purchase or have in his possession any "blazer" matches Sunday or at any other time.   But the State claims, and properly, that even these denials, if untrue, may add to the force of the circumstantial evidence.

*Rubber Tracks.* Notwithstanding the defendant's denial that he wore or saw his rubbers after Saturday morning, there is some evidence that he had on a pair of rubbers Sunday, at one time at least, though perhaps not all of the time. The testimony of those who saw him without rubbers, or did not notice rubbers, is not necessarily inconsistent with the State's claim that he wore rubbers on Sunday. As bearing upon the probabilities it appears that it had rained more or less for two or three days previously and that the ground was muddy, and that the shoes worn by the defendant were thin, low ones. The bottoms of the defendant's trouser's legs were muddy when he arrived at Telos Smith's, and his stockings were afterwards found to be muddy, though he says he got the mud on his stockings by using them to clean his muddy shoes. His shoes were introduced in evidence, and have been submitted to our inspection. As a result of that inspection, we are of opinion that the jury were justified in believing, if not compelled to believe, that the defendant did not walk in them that night without rubbers, in the muddy road and through woods and pasture for over six miles, as he says he did, and that, therefore, when he left West Cove, by whichever route he took, he had rubbers on his feet.

That the rubber tracks were made by new rubbers is uncontroverted. But the learned counsel for the defendant strenuously contends that the difference between the size of the defendant's rubbers and the size of the tracks found is so great as to preclude the possibility that the tracks were made by the defendant. The defendant's new rubbers as claimed by the State were No. 6 1-2 Bay State, cadet toe. The pattern designer of the manufacturer, a witness for the defendant, testified that a No. 6 1-2 rubber of that grade was 11 5-16 inches long, 4 1-16 inches wide across the ball, with a heel 3 inches long. It is to be regretted that there was not that degree of definiteness in the measurement of the tracks that would have been desirable. One of the two State's witnesses, who testified to measurements, says of one track that he measured it to the "best of his observation," while the other says of another track that he measured it as "near as he could come at it in a muddy place." A witness for the defendant, however, testified unqualifiedly that one

of the tracks was 10 1-2 inches long. Whether these measurements were in a straight line from end of heel to end of toe, or followed the contour of the ball to the toe does not appear. It is easily demonstrated that a No. 6 1-2 Bay State rubber measures more than a quarter of an inch longer, laying a rule upon it so as to follow the contour of the ball to the toe, than the same rubber measures in a straight line from heel to toe, when it stands naturally. Nor does it appear that the witness measured the width of the ball of the rubber at the same point in the ball that the other witnesses measured the ball in the tracks. A measurement of the No. 6 1-2 Bay State rubber introduced in evidence shows that at its widest point the ball is nearly a quarter of an inch wider than it is at its center, and at the widest point it measures 3 13-16 inches instead of 4 1-16 as testified to by the witness. It is claimed by the State that rubbers of the same number are not always exactly of the same size, and one witness measuring in the presence of the jury, testified that out of two pairs of No. 6 1-2 rubbers, three rubbers measured alike, while the fourth was a quarter of an inch shorter than the others and the ball an eighth of an inch wider. Moreover, it appears that these tracks were found in mud that had been soft, "in clear mud," as a witness for the defendant testified, and we are not satisfied that the measurement of a rubber track made in soft mud is always to be deemed a certain indication of the size of the rubber which made it. It is common knowledge that in very soft mud, the imprint of tracks may be filled and even obliterated by the yielding walls of mud. How well and how long such a track will retain its shape and size must depend to some extent at least upon the nature of the soil and the consistency or sponginess of the mud. To these special features attention does not appear to have been called, further than has already been stated. Upon the whole we can not say that the tracks could not have been made by the defendant's rubbers. Whether in fact they were so made involves other inquiries.

Under the circumstances of this case, a jury might well associate the maker of those tracks with the murderer of Mr. Allen. And the series of tracks from the railroad through the Bully road, the series of similar tracks through the Spencer road—all pointing towards

the Allen place—and the tracks of the same size and character back and forth between the Allen place and the camp, certainly would justify the jury in believing that the maker of the tracks first came down the railroad from the direction of West Cove, then through the Bully road and on through the Spencer road to the Allen place. It is to be noticed that though search was made for them in the place where he said he left them, the defendant's new rubbers were never found, and though he knew the officers were to make the search for them and the umbrella, he never manifested any interest in the result of their search.

*The Umbrella.* The defendant says he borrowed an umbrella of Telos Smith Friday night, took it to Greenville, left it at the Bartley House Saturday morning, and never saw it afterwards. There is the testimony of two witnesses that he had an umbrella in his possession Sunday, one of them saying that he had it in his right hand using it as a cane at about four o'clock and on the railroad, that is, at the very moment when the State claims he was leaving West Cove for Shirley. He did not have any umbrella when he reached Telos Smith's. He admits that he was in the vicinity of the Allen place and the camp Monday afternoon after the tragedy. Two girls testified that the defendant then sent their brother to the camp to get an umbrella for them, for it was raining; that he said "you can go down to my camp and get my umbrella, it is sitting there in the corner." The defendant denies this statement. But an umbrella was found at the camp by the brother, taken home by these girls, and taken to the defendant at Smith's on Wednesday by the mother of the girls. She testified that at first the defendant said that he didn't know whether it was his umbrella or not, that his was a double ribbed umbrella. She testified further that upon the defendant's attention being called to the fact that the umbrella returned was a double ribbed one, he said "It must be mine then," and that he then took it into the house. The defendant testified that he said that the umbrella was not his, but that the umbrella he had at the camp was something like that one, and in this connection he added, "I was satisfied it was the one I sold Elmer Huff. I am now very positive of it. The last time I saw it, it hung up in the camp at the foot of the bed on the wall on

a nail." In fact, the defendant had sold to Huff all that was in the camp except his trunk and clothes. But Huff testified that immediately after purchasing the camp he stayed in it for about five days, that he looked the camp over, and that neither when he purchased nor while he was staying there did he see any umbrella. Telos Smith, his daughter-in-law Ida and the defendant himself all testified that the umbrella borrowed by the defendant was not the one returned on Wednesday.

If the jury believed that the defendant had an umbrella when he left West Cove Sunday afternoon, but brought none home to the Smith house Sunday night, if they believed that he left no umbrella at the camp when he sold it, but· that there was an umbrella there Monday and that the defendant knew it was there and where it stood, though he had not been in the camp .that day, they might very pertinently inquire, how and when did that umbrella get into the camp, and how did the defendant know it was there if he did not carry it there himself. That the umbrella found was not the one borrowed from Telos Smith's, if such was the fact, we do not regard as of especial significance. Exchange of umbrellas, even accidental, is not an unknown occurrence. But whether the defendant had some umbrella in his possession at West Cove Sunday is important, and if so, his knowledge that an umbrella was in the camp Monday is of·much significance.

*Matches.* There was evidence that a box of "blazer" or "safety" matches was found in the camp Monday forenoon, four matches remaining unused, that no matches of that kind had ever been used or seen in the camp before that time, and further that the defendant purchased a box of such matches at West Cove Sunday forenoon. The defendant denied making any such purchase, or any knowledge. of the matches, and there was evidence that several dealers in the vicinity of Shirley were accustomed to buy and sell such matches. If the jury believed that the defendant purchased blazer matches Sunday, it is significant, indeed,. that matches of the same peculiar kind, never before known to have been in the camp, were found there on Monday, and all the more significant in view of the fact that the defendant denies purchasing any such matches.

*Blood Spots.* It does not seem to be controverted that blood, which answered all the tests of human blood, was found on the inside of the defendant's right trousers' pocket, on each cuff of his white shirt, and on the inside of the left cuff of his undershirt. But the defendant explained the existence of blood spots by saying that after he had purchased these clothes, he had been afflicted with a humor on both hands, which caused them to become sore and raw. And in this last statement he was corroborated by other witnesses. No other blood, however, was found upon his clothing, and it is urgently claimed by his learned counsel, that it would have been practically impossible for the defendant, a slight man, to remove the bleeding body of Allen, a large man, from the large blood spots on the ground to the barn, twenty-five feet, without getting blood upon the outside of his clothing, and that this impossibility is all the more apparent in view of the fact, as testified to by some of the witnesses for the State, that there was no appearance of the body's having been dragged on the ground. This is, indeed, a fact of much significance. We should expect under such circumstances to find blood upon the clothing. The absence of blood would be a matter of grave consideration. But we cannot say that such a condition of things is necessarily inconsistent with the guilt of the defendant as charged, or that the jury, if they believed from the other evidence in the case that the defendant was present at the scene of the tragedy, would not be warranted in saying also that he removed the body. For unquestionably the murderer did remove it.

Besides these circumstances, the State places much reliance upon the failure or inability of the defendant to give a truthful account of his movements Sunday night. The State claims that his story about walking down the Lake road is shown to be false,—that it was the effort of a guilty mind to throw pursuers off the scent,— and that his statement of the manner in which and the purpose for which he cut the piece from the flap of his shirt is demonstrably false. There is evidence that two teams passed over the Lake road going northerly between the hours of six and seven o'clock, while the defendant according to his story must have been in the road between King's Crossing and the spring, and that the occupants met no one

walking down. The defendant says he did not meet or see anyone after he got into the Lake road, and does not say that he heard any teams while he was out of the road. There was the testimony of ten witnesses, living or being between King's Crossing and Telos Smith's on the Lake road between the hours of five and eight o'clock that evening, all of whom were more or less out of doors and about their buildings and in their yards, not one of whom saw any man walking down the road. Several of them testified to seeing the two teams. Two witnesses state that they were at the Bodfish place forty-five rods north of Telos Smith's that evening, that they were in the yard three rods from the road all of the time from half past seven to half past eight, and that they saw no one pass. But the defendant, if his story is true, must have passed the Bodfish house in the road at about eight o'clock. There is some evidence, also, that the defendant's description of the spring which he says he visited is incorrect.

But perhaps the most potent evidence against the defendant in this connection is his account of the manner and purpose of cutting the piece from the flap of his shirt. This shirt was exhibited to the court at the time of the argument. We think a jury would have been warranted in believing it utterly improbable, if not impossible, that so even and regular and smooth a cut as this one is across the top of the piece could have been made by the defendant with a knife while the shirt was upon his person, as he testifies. But this missing piece of the flap has a deeper significance than merely to convict the defendant of falsehood. Why was it cut? The defendant says that it was to furnish a wrapping for his sore toes. But this explanation can hardly be deemed satisfactory in view of the fact that the defendant then had a handkerchief in his pocket, and apparently owned no other white shirt. What became of the piece? The defendant says he left it somewhere about his room. But it has never been found though careful search was made for it. Was it destroyed by the defendant? If so, why? Did it bear upon it, as the State contends, the incriminating marks of an accomplished rape of Carrie Allen, as the result of his lascivious desires, inflamed perhaps by the whiskey he had drunk? Undoubtedly the defendant is the only person who can answer these questions with absolute certainty. But

in view of the other evidence in the case, this circumstance has great significance, and was entitled to grave consideration by the jury.

While it may be said with truth, that evidence of single circumstances standing alone, as of the rubber tracks, or of the umbrella, or of the matches, or of the blood spots, or of the missing piece of the shirt, might not be sufficient to warrant a conviction, yet the combined force of many concomitant and interlacing circumstances, each insufficient in itself, may lead a reasoning mind irresistibly to the conclusion of guilt.

To summarize the propositions, in support of each of which there is some apparently credible testimony: — If the jury believed that the defendant's story of his walk from West Cove down the Lake road was not true, that his story that he wore no rubbers was not true, that the story of the purpose for which he cut his shirt was not true, that his story about leaving his rubbers and borrowed umbrella at the Bartley House Saturday morning was not true; if they believed, notwithstanding his statements, that he did buy a box of blazer matches in West Cove Sunday, that he did have rubbers and an umbrella in his possession Sunday, that he did start down the railroad towards Shirley with rubbers on his feet and an umbrella in his hand; if they believed that the rubber tracks in the Bully road, the Spencer road, and the path between the Allen place and the camps, might have been made by his rubbers; if they believed that he took no umbrella home to Telos Smith's that night, that on the following day he knew that an umbrella was standing in the camp; if they believed that he had not left any umbrella in the camp when he sold out to Huff, and that the presence of the umbrella in the camp was not otherwise accounted for; if similar matches were found in the camp like those he had purchased the day before; if after inspection of his shoes they believed that he wore his rubbers from West Cove, though he and Telos Smith and Ida Smith testified that his shoes were muddy, and if they believed further that there was some cause for the disappearance of the rubbers, which might be that there was some tell-tale mark upon them, or that the defendant had learned, as he undoubtedly did learn on Monday, that rubber tracks had been discovered; if they disbelieved his story about the cutting

of the shirt, but believed that the missing piece, for some cause, had been put out of the way by him,—to say nothing about the blood spots on his clothing, which the jury may have considered were satisfactorily explained,—we can not say that the jury were not warranted in believing beyond a reasonable doubt that the defendant was at the "camp" Sunday night, and in the path between the camp and the Allen place. All of these circumstances tend very strongly indeed to show that the defendant was there. And if he was there, there can be no reasonable doubt of his guilt, under the circumstances.

So much for the incriminating circumstances relied upon by the State. There was other evidence, as for example, the testimony of a detective, who had various conversations with the defendant, which we do not deem it important to consider in detail.

It is necessary now only to notice more specifically the defendant's claim of an alibi. Besides his own testimony, he strongly relies upon the testimony of Telos Smith and his daughter-in-law Ida Smith to show that he was at the Smith house and in bed not later than quarter past nine o'clock, which was just about the hour when the reflection of the Allen fire was first noticed, and presumably a very short time after the fire had been set. He insists that if the testimony of the Smiths as to the time of his arrival is true, he could not possibly have committed the crime at the Allen place three miles away. He claims that if he had committed the crime of murder and set the fire long enough before nine o'clock for him to get back to Smith's at about that time, the fire must have been noticed earlier than it was, and that if the fire was not set until a short time before its reflection was seen, as it probably was not, he, if he had set it, could not have got to Smith's as early as Telos Smith and Ida Smith testified that he did. This claim is probably quite true. The element of uncertainty about it, upon the defendant's assumption, is that neither Telos Smith nor Ida Smith state definitely the hour when the defendant reached their house. They state it only by judgment or estimate.

We think it is evident that the jury did not give full credit to the testimony of the Smiths. They were friends of the defendant, of the

same nationality as he, and in whose house he made his home for the time being. Neither of their statements, as to the time he arrived, agrees with the defendant's statement, nor with each other's. The defendant says he arrived there "at a little past eight o'clock" by his watch, which he noticed. Telos Smith testified that he himself went up stairs to bed at a quarter past eight, that he could not tell exactly how long he had been in bed when the defendant came. He said it was "about half an hour, or may be three-quarters of an hour, or may be an hour," "my judgment would be three-quarters of an hour." He testified that he had not been asleep. But a witness in rebuttal testified that Smith told him that he had been asleep, that sometime during the night his son's wife called him and said there was a man at the door, that it was the defendant, and that Smith further said he didn't know what time it was. Smith denied this however. Ida Smith testified that the defendant came fifteen or twenty minutes "after Telos came up stairs." There was some evidence in impeachment, that she had expressed a purpose of "standing by" the defendant. But this she denied. It must be conceded, we think, that the evidence even of reliable witnesses as to the lapse of time in the night, when they are abed, at an hour when consciousness is likely to be dulled, and when there is nothing to impress time particularly upon judgment or memory, is not a satisfactory basis upon which to erect an alibi, particularly so, when, as in this case, the change of an hour, and perhaps less, may weaken or altogether destroy its probative force. Under these circumstances, and remembering that the jury could determine much better than we can how much credit should be given to the Smiths as witnesses, we are of the opinion that there is nothing in the attempted alibi which requires the verdict to be set aside.

*Appeal denied.   Judgment on the verdict.*