STATE OF MAINE

*vs.*

WILLIAM B. MCKRACKERN.

Sagadahoc.    Opinion, March 27, 1945.

*Ralph O. Dale, County Attorney,*

*John P. Carey,* for the State.

*Clarence Scott,*

*Hayden Covington,* Brooklyn, N. Y., for the respondent.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MURCHIE, CHAPMAN, JJ.

HUDSON, J. On exceptions and appeal from a conviction for assault on an indictment based on Sec. 27 of Chap. 129, R.S. 1930, as amended by Sec. 6 of Chap. 92, P. L. 1933. The statute as amended reads as follows:

> "Whoever unlawfully attempts to strike, hit, touch, or do any violence to another however small, in a wanton, wilful, angry, or insulting manner, having an intention and existing ability to do some violence to such person, is guilty of an assault; and if such attempt is carried into effect, he is guilty of an assault and battery, and *any person convicted of either offense when it is not of a high and aggravated nature, shall be punished by a fine of not more than $100 or by imprisonment for not more than 6 months or by both such fine and imprisonment; and when the offense is of a high and aggravated nature, the person convicted of either offense* shall be punished by a fine of not more than $1,000, or by imprisonment for not more than 5 years, when no other punishment is prescribed."

The words above in italics constitute the amendment of 1933.

The Justice below denied the respondent's motion for a directed verdict and the denial constitutes one alleged error in the bill of exceptions. That, however, will be considered in discussion of the appeal, for "denial of respondent's motion for a directed verdict and the appeal from the denial of the trial Judge to set the verdict aside . . . present like questions and 'accomplish precisely the same result.'" *State* v. *Smith,* 140 Me., 255, 283; 37 A. (2d), 246, 258. Also see *State* v. *Bobb,* 138 Me., 242, 245, 246; 25 A. (2d), 229, 231.

## THE APPEAL.

The only question raised before this Court on the appeal "is whether in view of all the testimony the jury was warranted in believing beyond a reasonable doubt that the respondent was guilty." *State* v. *Smith,* supra, on page 286 of 140 Me., and 259 of 37 A. (2d), and cases therein cited.

In *State* v. *Lambert* (a homicide case), 97 Me., 51 (53 A. 879), our Court in speaking of the functions of the jury stated on page 52:

"We may say at the outset that in considering the weight of this testimony, depending as it does for its effect upon the credibility of the witnesses, we cannot put ourselves in the place of the jury, nor usurp that province of deciding questions of fact which the law imposed upon them. Their conclusions, if warranted by the evidence, are to stand. We have before us only the pages of a printed record, aided somewhat by an inspection of the exhibits which were introduced in evidence at the trial. The jury had before them the living, speaking witnesses. The degree of credence properly to be given to the story of a witness may de-

pend much upon his appearance upon the stand, upon his air of candor and truthfulness, upon his seeming intelligence and honesty, upon his apparent want of bias or interest or prejudice. The want of such characteristics may render testimony of little value. And the appearance of such characteristics, or the want of them, is not always transcribed upon the record of a case. If the story of a witness is seemingly credible and probable, and not inconsistent with other admitted or proven facts, the listener has much better opportunity to judge correctly of its truthfulness than a reader has. From the bare record we might be in grave doubt as to which of two conflicting statements is true. The jury, seeing the witnesses, might have no reasonable doubt. And it follows that in cases like the one under consideration, as in all others, the jury must be the final arbiters of questions of fact, when the evidence in support of their conclusions, considered in connection with all the other evidence, is of such a character, such a quality and such weight, as to warrant them in believing it."

It is contended this offense was committed in the village of Topsham in the town of Topsham. Topsham is northerly of and across the Androscoggin River from the town of Brunswick. A state highway leads over the bridge to Topsham and to points further north in the state. On its westerly side in the village of Topsham there is a sidewalk with a fence on the west consisting of posts driven into the ground, to which are attached two lengthwise wire cables. From a plan introduced it would appear that the upper cable is approximately three feet above the ground. Employment of violence it is asserted was started on the sidewalk in the vicinity of a highway culvert several hundred feet northerly of Pop's Place, a small store near the north end of the bridge.

The land westerly of the fence at the place of claimed attack, unoccupied by any building or buildings, descended steeply some distance down into a ditch, where the violence ceased. Northerly of this place were certain buildings westerly of the highway, in one of which lived Deputy Sheriff Carver. The first of these buildings in the bend of the highway almost wholly obscured vision from uptown. On the easterly side of the highway there were no buildings immediately across, but a short distance northerly on the east side were Bushy's filling station (sometimes called the Topsham filling station), a street entering from the east, a bank, Whittier's filling station, and still further north on both sides of the highway were other buildings comprising a portion of the village of Topsham. There was no sidewalk on the easterly side of this highway in the vicinity of the place of alleged assault.

The respondent, 28 years old, married and living in Bowdoinham, was an ordained minister of the Gospel, a member of Jehovah's Witnesses. In the forenoon he left home to go to Brunswick to attend to some business at the O. P. A. office and he was on his way home at the time of the occurrence.

Mrs. Cloutier, the complaining witness, who lived in Topsham, was a married woman then five months along with child. Her husband worked at the Bath Iron Works, and in the latter part of the afternoon she started afoot to meet him on his return home. The offense is claimed to have been committed at approximately 4:30 o'clock in the afternoon of January 22, 1944. The evidence shows that then there was a considerable accumulation of snow and that along this fence there was quite an embankment of it, probably occasioned by plowing of the sidewalk.

The State's version of what took place follows: Mrs. Cloutier was walking southerly on this sidewalk on her way to Brunswick, and when in the vicinity of the culvert saw this man coming northerly on the sidewalk about to meet her. They were strangers. She testified:

"And as I was walking along on the sidewalk I met this man, and as I met him supposedly to pass him he put one hand in between my legs and on my private parts. . . . And he put one arm around me. . . . And he pushed his head like that (illustrating) and threw me back into the snow. . . . When I got over in the bank he had one hand over my mouth, and one hand still on my private parts."

On cross-examination the following questions and answers appear:

"Q. What did he do? Where did he put you then, when he had his arm around you and his left hand on your private parts?

A. He lifted me up and threw me over the fence.

Q. . . . Do you mean to tell me that he lifted your feet clear up over the fence?

A. Of course, he did.

Q. And you didn't say anything until you got down in the ditch. Is that right?

A. I hollered.

Q. You hollered when he put his arm around you. Is that right?

A. Yes.

Q. And did you scream?

A. I did, yes.

Q. Loud? Did you say anything to him?

A. I told him to leave me alone.

Q. What were you doing with your hands?

A. I tried to push him away.

Q. Did you push him back?

A. I tried to push him back.

Q. Did you push his arms away from your private parts?

A. I tried to. . . . I tried to get away from him.

Q. . . . Your first opportunity to talk to this defendant was when—first opportunity to say anything to him was when?

A. At first I said 'Leave me alone'.

Q. And when was that, before you were thrown over the fence?

A. Yes.

Q. And after the defendant threw you over the fence did he continue to have his arms around you when you fell down in the ditch?

A. He did.

Q. And then you both went over the fence at the same time. Is that right?

A. That's right.

Q. When was it that he had his arm over your mouth?

A. After we landed in the snow.

Q. How did he get his hand off of your face?

A. I managed to push it off after a while.

Q. And what did you say to him then?

A. I said 'I wish you would leave me alone; I am going to have a baby'.

Q. And what did he say then?

A. He says 'Oh, all right', and he helped me up."

She also testified that after the assault he helped her back to the sidewalk. Her leg was injured as it went down through the crusted snow and her neck was bruised. It did not appear that anyone saw the claimed attack, but immediately after Mrs. Cloutier had gotten back to the sidewalk, she saw Mr. Keough, a State witness, approaching on it from the bridge. She told him what had happened, pointed to the respondent then proceeding up the sidewalk a short distance away, and inquired if he knew who the man was. He said,

"No, but I will find out." He then followed the respondent to a point in front of the post office where a Navy bus stopped, from which Mr. White, a guard at the Bath Iron Works, got off. Keough requested his aid. For a while both followed the respondent and then White went to Deputy Sheriff Carver's house. Soon Carver, who had commandeered a private automobile with driver, came and the four men finally found the respondent and started back with him to Bushy's filling station where Mrs. Cloutier was waiting.

As soon as she had told Keough about the assault, she had gone across to this station. There she saw a Mr. Siegers who she said had just come out of the door. She asked him if he knew who the man was then still walking up the street. He did not. Apparently Siegers was not outdoors or in any position to see any part of the assault. He told her he would get in touch with the State Police and would follow the respondent. He asked her to go into the office and wait, which she did. Mr. Siegers testified that she was nervous and excited and was crying part of the time.

Mr. Keough testified that as he was coming along the sidewalk and when he was about 75 yards beyond the north end of the bridge, he heard a scream. He saw nothing then but as he proceeded along he noticed Mrs. Cloutier and the respondent coming up the embankment to the fence. He said, ". . . she was in a very nervous condition, and her clothes were busted and she had snow on her coat, and she was crying." When asked if the respondent was the man who came up over the bank with Mrs. Cloutier, he answered, "Absolutely."

She then told him what had happened. He testified what he did to overtake the respondent and find out who he was, how he had requested White to aid him, and how later he and Mr. White got into Carver's automobile and with the respondent therein drove back to the filling station where Mrs. Cloutier was waiting. When the car got to the filling

station with its occupants (Mendes the driver, Carver the deputy sheriff, White the government guard, Mr. Keough, and the respondent), Mr. Carver got out of the car, went into the station, got Mrs. Cloutier, and brought her out to the car where he asked her, "Is the man in this car that assaulted you?" Her answer was, "Yes, he is," and then asked Mr. Carver, "Which one is it?" and she pointed to Mr. Mc-Krackern. Carver continues: "I said to Mr. Keough, 'You say you have been following this man, and is he the man that was at the scene when you arrived, as you have told me?,' and he says 'Absolutely'. I said 'Mr. White, you have come into the picture, as Mr. Keough has told me, and is this man that she has just pointed out to me the man that you saw coming up the street that Mr. Keough showed you?, and he said 'Absolutely, it is.' " The identification was testified to by all the occupants of the car except Mr. Mendes, who was not a witness. Then Mr. Carver took the respondent to the Brunswick police station.

The version of the respondent, on the other hand, uncorroborated on all vital points, was a complete denial of the assault. While he admitted that he was in that vicinity at the time, he denied that he was on that sidewalk or that he saw Mrs. Cloutier there or had even seen her. While he also admitted that he was picked up by Officer Carver and went in the automobile down to the filling station, and that Mr. Carver got out of the car and went into the filling station, he denied positively that any woman came out of the station and identified him as her assailant. He said that he came across the bridge, went into Pop's Place, came out and crossed over to the other side of the street where there was no sidewalk, and walked up on the east side of the highway, but he did say that later when he reached a point in the village where the sidewalk was shovelled clear of snow, he turned off the street and travelled on it.

Thus the jury was presented with two conflicting stories

that were absolutely irreconcilable. It was put to the necessity of deciding which was the true version, that of the State based on Mrs. Cloutier's testimony and in part by that of corroborating State witnesses, or that of the respondent uncorroborated. It found as true the contentions of the State. It would seem that the jury were virtually compelled to find that the respondent testified falsely when he denied the testimony of Mr. Keough as to coming up from the ditch to the sidewalk with Mrs. Cloutier, and also when he denied that Deputy Sheriff Carver brought Mrs. Cloutier out of the filling station to the automobile where she identified him as the man who had attacked her. These denials no doubt tainted all essential testimony of the respondent. They must have destroyed the jury's confidence in his veracity. There was nothing whatsoever in the record on which to found any claim upon the part of the defense that either Mrs. Cloutier or any other witness for the State had any motive or desire to frame him. None of the witnesses for the State had previously known the respondent. Neither had its principal witness, Mr. Keough, known her.

Two questions in particular presented themselves to the jury: (1) Was there any assault? and (2) If so, who was the assailant? Our study of the record convinces us that there was ample proof as to the assault and the assailant. We think that the jury was warranted in believing beyond a reasonable doubt that the respondent was guilty of the assault.

Counsel for the respondent argues with insistence that Mrs. Cloutier's testimony is so improbable and unbelievable that it constitutes a miscarriage of justice to permit a judgment to stand upon the verdict. He asserts this claim of improbability principally because of the place where and the time when it is said the offense was committed. But inferences as to probabilities, while they should receive careful consideration by the jury, should not overcome convincing, direct proof of facts evidencing guilt. What one would expect

to have taken place under certain circumstances should not outweigh proof of what actually took place. There is no rule or ascertainable means by which it may be determined that even an atrocious crime will not be committed at some particular place or at some particular time. Apparently something in the criminal's mind governs his action. Just what, we do not know, but it is common knowledge that atrocious and brutal crimes and particularly those of sex have been and will continue to be committed in places where and at times when it might be considered improbable. In this case it must be that something, probably an intense sex passion, prompted this man to do what he did.

It is also argued in defense that if this assault had taken place Mrs. Cloutier, on account of her pregnancy, would have immediately gone to her attending physician for physical examination. It was not claimed that her pregnancy was affected and probably she did not consult her doctor because she was not conscious of any ill effect upon it. As a matter of fact, however, a short time afterwards she did consult him as she had been doing occasionally. It is not claimed that the assault could not have been committed without affecting her then condition. The jury might well have considered that the depth of snow protected her from harm that otherwise might have resulted. She did give birth to a child some four months later. We do not consider that the fact that she suffered no ill effect to her pregnancy was sufficient to raise a probability that no assault took place, in view of other testimony in the case strongly evidencing the assault.

Also, it is argued in defense that the assault could not have been committed because they both had on winter clothing. While she testified that he had his left hand on her private parts, the evidence is not clear whether outside or inside her clothing, but either would have been possible in spite of winter clothing.

The contention of the defense that Mrs. Cloutier "may

have been under a serious mental delusion at the time of the alleged assault and at the time of respondent's arrest and subsequent trial" does not impress us. It is simply an assertion of words without any foundation in fact in the record on which even an inference could be based.

It is strongly argued that it was absolutely impossible for this respondent weighing 192 pounds to have put this woman, weighing approximately 150 pounds, over this fence. That, of course, was a fact for the jury's determination. A reading of the testimony does not convince us that the jury could not have found as proven beyond a reasonable doubt that he did in some way get her over the fence. Otherwise, Keough's testimony was false that he saw them coming back up the embankment. We think the jury could well have found that he grabbed her as she said, pressed her back against the snowbank and the upper strand of the cable, and forced her over the fence, he all the time retaining his hold, and that then they rolled or slid together down the steep embankment to the ditch. Such a finding would obviate the necessity as contended by the defense of the jury's "believing that the respondent, holding the woman as she claims he did, jumped three feet and scaled the fence." But however they got over, the jury was warranted in believing that they did, because Keough saw them returning to it.

To have justified the jury to have reached a verdict of not guilty, it would have had to disregard in large measure the testimony of the State's disinterested witnesses as well as that of Mrs. Cloutier, and have accepted as true the uncorroborated testimony of the respondent, most interested in the outcome of the case.

In his argument on the appeal, counsel claimed that "The undisputed evidence shows as a matter of law that no aggravated assault and battery was committed by the respondent upon Dorothy Cloutier because no serious bodily injury was shown and only a common or simple assault and bat-

tery was established; and, moreover, no intention to commit an assault and battery was established by evidence." The matter as to intent will be dealt with later in connection with one of the exceptions relating to refusal to give a requested instruction. We deal now with the contention that there was no proof of an *aggravated* assault as found by the jury. To secure conviction under this statute this was not necessary.

In the defendant's brief are many citations from other jurisdictions as to what may constitute an *aggravated* assault. But the statute on which this indictment was drawn does not create an offense of *aggravated* assault. It is still assault, although of an aggravated nature. Our Court since the amendment of 1933 said in *Rell* v. *State of Maine*, 136 Me., 322, on page 327, 9 A. (2d), 129 at page 131:

> "As we construe the new law, we are not of opinion that the legislature intended to divide assault and battery into separate and distinct crimes. It is still assault and battery which is punishable, *and facts which establish that the offense is or is not of a high and aggravated nature go only to the measure of punishment and need not be alleged.* The rules laid down for charging the offense under the general statute are neither abrogated nor changed by its amendment. The authorities already cited are controlling precedents for holding that assault and battery, regardless of its enormity, may be charged in general terms without specifying the means by which it was accomplished, and appropriate punishment imposed." (Italics ours.)

Thus, as before the amendment the statute provided for the offenses of assault and assault and battery, so it did after the amendment. No new offense of what might be called an *aggravated* assault or assault and battery was added. The matter of the aggravation has to do only with the sentence

and is a matter for the Court, whose duty it is to sentence. The matter of aggravation need not be alleged in the indictment and if it is, it may be considered as surplusage. The jury has no duty to declare aggravation in its verdict, and if it does, it adds nothing. The conviction would still be of assault or assault and battery. Therefore, it is not for us in this proceeding to determine whether that which was done constituted aggravation or not. That was a matter for the trial Judge and if in his opinion aggravation did attend the commission of the assault, then under the statute he had a right to give the more severe sentence as he did.

### THE EXCEPTIONS.

In the first exception charged as error was the refusal of the trial Judge to order a segregation of witnesses so that "all of the witnesses for both the State and the respondent be sworn and excluded from the courtroom out of the presence and hearing of the court and jury except the one witness testifying."

In *State of Maine* v. *Cox*, 138 Me., 151, 23 A., 2d, 634, we stated on page 178:

> "In this state there is no statute or rule of court requiring the presiding justice, on motion, to segregate the witnesses during the trial. Whether or not the witnesses should be segregated in a given case, rests in the sound discretion of the court, to whose ruling an exception will not lie unless it appears that there has been an abuse of discretion."

As said in the *Cox* case, supra, so we say here, this exception cannot be sustained, for the record shows no abuse of discretion in refusing to order the witnesses segregated.

The second exception relates to the refusal to direct a verdict for the respondent, which has already been dealt with in connection with the appeal, and secondly, that "there is no proof that the offense alleged was committed in the County of Sagadahoc." But there was ample testimony to show that this offense was committed in the town of Topsham, and judicial notice must be taken that the town of Topsham is in the County of Sagadahoc. *Harvey et al., Petitioners,* v. *The Towns of Wayne, Readfield, and Winthrop, Appellants,* 72 Me., 430, 432; *Coffin* v. *Freeman,* 84 Me., 535, 540, 21 A. 986.

The third exception was taken to the refusal to give the following requested instruction:

> "An assault and battery is committed by carrying into effect an unlawful attempt to strike, hit, touch or do any violence to another, however small, in a wanton, wilful, angry or insulting manner, having an intention and ability to do violence to such other person. That offense cannot be committed by the respondent if, at the time of doing the alleged act as charged in the complaint, his mind was innocent of any evil, wanton, wilful, angry or insulting intent to the complaining witness. It is necessary for the State to prove that the respondent at the time did have such guilty and evil intent coexistent with his overt act, and if you find that he did not have such evil intent, or if you have a reasonable doubt thereof, you will acquit the respondent and by your verdict say not guilty."

As to refusal to give this instruction, counsel for the defense insists that "It was prejudicial error for the trial court to infer to the jury that intent to do bodily injury was not an element of the offense in reading the requested instruction

to the jury and then stating that it was refused and to refuse said request that properly presented said issue to the jury." Counsel also said:

> "Here the court permitted the jury to *infer* intent. Nowhere in the court's charge did he instruct the jury that it was necessary for the State to *prove* that the respondent actually intended to commit an aggravated assault and battery upon the person of the complainant."

It will be noted that the exception was taken, however, not to the failure properly to instruct the jury on the issue of intent, but simply to the refusal to give the particular requested instruction. As a matter of fact, the Court in its charge did inform the jury of the provisions of the statute on which this indictment was based, including as an essential element of the crime "*an intention* and an existing ability to do some violence to such person." (Italics ours.) If that said in the charge as to intention were deemed insufficient by respondent's counsel by reason of omission of something more that should have been said, then it was his duty before the jury retired to call the attention of the Court to that fact. *State* v. *Smith,* 140 Me., supra; on page 284, 37 A., 2d, 246. Instead, however, of requesting instruction as to some omission or for further amplification as to that said by the Judge, respondent's counsel presented the particular request above-stated and the question is whether *that* instruction should have been given.

While at first blush the law as stated in the request seems to be accurate and no harm might have resulted from the giving of it, yet upon reflection and careful consideration we think the Court was warranted in denying it. Had it been given, it might have afforded an opportunity for a verdict of not guilty on a mistaken understanding of the law by the

jury obtained from the instruction itself. The jury might have understood that it was necessary that there be separate and independent proof by way of evidence of non-innocent intent upon the part of the respondent. The law, however, is well settled in this State that proof of the intent under this statute may *be inferred* by the jury from the act itself. In the request no statement was made that the intention might be inferred from facts proven. In *State* v. *Sanborn,* 120 Me., 170 (113 A., 54) our Court said on page 173, then speaking of the crime of assault and battery:

> "It is obvious that the crime would not be committed if, at the time of doing the act, the mind of the doer were innocent. Therefore, it was incumbent on the State to prove respondent's guilty intent coexistent with his overt act. *State* v. *Carver,* 89 Me., 74. *A guilty intention may be inferred as a fact by the triers of fact from the act itself.* And as it may be thus inferred, so the circumstances which attended the doing of the act may show its absence. *The general rule in a case of assault and battery is that, if it be proved that the accused committed the unlawful act laid against him, it will be presumed from his violent conduct, and the attending circumstances, and the outward demonstration, that the act was done with a criminal intention; and it will be left for the accused to rebut this presumption.*" (Italics ours.)

To have given the instruction as requested would have only partially stated the law as to the necessity of proof of intention and would have been extremely prejudicial to the State. The respondent takes nothing under this exception.

Counsel for the defense not only complains because of the refusal of the instruction here considered, but to the reading of it to the jury. In this we see no prejudicial error. Be-

sides, it accords with custom and practice which have obtained in this jurisdiction for many years.

One other requested instruction was refused, to which refusal exception was taken. It reads as follows:

> "The respondent has alleged and testified that he did not assault the complaining witness on the day in question, or at any other time, and that he did not commit the offense as alleged in the complaint. You are instructed that the burden is not upon the respondent to prove that he did not by a preponderance of the evidence, or to a moral satisfaction, but if upon all the evidence introduced before you, you have a reasonable doubt that he did not assault the complaining witness on the day in question, and did not commit the assault, as alleged, or that he was not the man alleged to have committed the assault, you will acquit the respondent and by your verdict say not guilty."

This request was properly refused for the reason that the Court in its charge had already given the substance of the requested instruction. It was not necessary to restate it in the language of respondent's counsel. *State* v. *Cox*, supra, on page 169. The Court gave a full explanation as to the meaning of the term "reasonable doubt" and made it perfectly clear to the jury that before conviction of *this* respondent could be had it must find *him* guilty beyond a reasonable doubt. Then in the latter part of the charge were these words:

> "Now if you are convinced beyond a reasonable doubt, as I have defined it to you, that *this respondent* is guilty as charged, you may bring in a verdict of 'Guilty.' If there is a reasonable doubt in your minds as to *his guilt*, you will bring in a verdict of 'Not

guilty.' This is to be determined on the evidence which has been presented before you, and upon which you must decide that question." (Italics ours.)

*Exceptions overruled.*
*Appeal dismissed.*
*Judgment for the State.*