STATE OF MAINE
*vs.*
GEORGE WHITEHEAD

York.   Opinion, August 8, 1955.

136 

*William P. Donahue,* for State.

*Elton H. Thompson,* for respondent.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, JJ., THAXTER, A. R. J. TAPLEY, J., did not sit.

FELLOWS, C. J. This is a complaint against George Whitehead before a Trial Justice in York County for night hunting. After hearing, the respondent was found guilty by the Trial Justice and appealed to the Superior Court for the County of York. He was tried in the Superior Court before a jury, found guilty, and a fine of $300 imposed. The case is now before the Law Court on exceptions relative to certain evidence admitted or excluded during the trial, and on a motion of the respondent to establish exceptions which were stated in the bill of exceptions but disallowed by the presiding justice.

The testimony is conflicting but in substance the story is this: On or about September 18, 1954, a complaint was made by a State Game Warden in a Trial Justice Court for York County alleging that "George Whitehead of Hollis, York County, Maine, on the sixteenth day of September in

the year of our Lord one thousand nine hundred and fifty-four, at Waterboro, in said county, did then and there unlawfully hunt certain wild animals, to wit: deer in closed season, between the hours of one half hour after sunset and one half hour before sunrise of the following morning against the peace of the State, and contrary to the form of the Statute in such case made and provided."

The respondent was found guilty by the Trial Justice and appeal taken. Upon appeal the evidence heard by the jury shows that three deer were killed by the respondent in the night time, during closed season, at the Waterboro farm of Benjamin Hamilton, September 16, 1954. The killing of the three deer took place between one half hour after sunset on the sixteenth and one half hour before sunrise of the following morning. These facts appear in the testimony of the respondent.

The respondent claimed, however, that he was an employee of Hamilton, and that he had complied with the provisions of the statute that permitted the killing of deer by the owner or his employee while substantial damage was being done by the deer to the owner's crops.

Game Warden Mahaney testified that Mr. Hamilton called at his home in Saco on September 17, 1954, and reported that he (Hamilton) had shot three deer. The warden went to the Hamilton home in Waterboro and saw three deer hanging from a beam in the cellar and learned from Mrs. Hamilton that the respondent Whitehead, and not Hamilton, had shot the deer. Mahaney went down the road to a field owned by Hamilton and from circumstances ascertained that two of the deer had been shot in the field and dragged across the field, and that the third deer had jumped over a stone wall into another field.

Supervisor Marsh, of the Department of Inland Fish and Game, testified that he questioned the respondent, and that

the respondent said that he was not related to Hamilton or employed by Hamilton, and further that he (the respondent) was to have some of the deer meat. The respondent also told the Supervisor that Hamilton was an old friend and former neighbor, that Hamilton was having trouble with deer in his garden; that Hamilton being elderly was not able to kill the deer himself, so the respondent went for the purpose of doing it for him. The respondent exhibited a .32 Remington automatic and a five cell flashlight that he had used. The respondent said that he fired three shots and got the three deer. The respondent stated that it was agreed with Hamilton that Hamilton was to assume responsibility for the killing and to report to the warden. Respondent stated that the deer were shot before midnight on the 16th.

Hamilton testified that he had a garden of beans planted in the spring, and that deer destroyed the first planting. He planted again, and on September 16th the deer were still damaging the garden. Another garden of vegetables was also damaged and was continually being damaged. Hamilton testified that he then went with his son to see the respondent Whitehead. "Q. Did you ask him anything about helping you in any way? A. Well, we talked the situation over. I don't remember whether I ever said to him directly, 'Will you come up?' or, 'I want to hire you.' By the Yankee's trade, we came to a mutual agreement that he was going to come and do the job if he could."

On the evening of the 16th, Hamilton said he drove his car to a field, taking the respondent Whitehead with him. Whitehead went towards the garden. Whitehead fired, and they found the three dead deer in Hamilton's fields. Hamilton also testified: "Q. And when all three of them were shot at, were they in the vicinity of the garden or in the garden? A. I couldn't say as to that, but from the sound, it was in the vicinity or in the garden so far as I could tell."

Whitehead dressed the three deer after they were "dragged out." Hamilton then went to wardens to report that he (Hamilton) shot the three deer. Hamilton had never notified wardens before this killing that deer were injuring his garden. On September 16th all that was left in the gardens were beans, tomato plants, kohlrabi, lettuce, cabbage, and endive. "We had enough garden left for our own use." "I felt that if I got this man (Whitehead) into a scrape, it was up to me to assume the responsibility for it all." When the deer were shot, Hamilton said that he did not know "for sure" whether they were in the garden or in the fields. There was no understanding that Whitehead would be paid for killing the deer. "He did something for me, and I did something for him; I'd tell him what I'd need, what my trouble was, and he'd come down and do it." "Swap favors all the time."

Respondent Whitehead testified that some time before, Hamilton told him that deer were damaging his crops and asked him to come and "help him shoot them." There was no "specific trade" made as to what the respondent was to receive for going. One or two nights Hamilton and respondent went out, but deer were in the fields and not in the garden, and respondent returned home. On the night that he shot the deer, he testified they went out about ten o'clock, but the deer were in the fields and they went back to the house and watched television until later. About midnight, "it could have been before, and it could have been after, I don't know." "I looked up in the garden and there is a bunch of deer in the garden, and I went up and shot at those." The respondent testified he "spotted" the deer with a flashlight that he held against the gun. Respondent fired three shots. The deer were "found one in the field, another one over the wall, and another one we didn't find that night. We found it the next morning."

The following statutory provisions are applicable. "It shall be unlawful to hunt wild animals from ½ hour after

sunset until ½ hour before sunrise of the following morning." Revised Statutes 1954, Chapter 37, Section 77.

I. Any person may take or kill deer, night or day, on land owned or occupied by him, where substantial damage is being done by deer to a fruit tree or a crop, including legumes, except grass; and he may authorize a member of his family or a person employed by him to take such deer. A person by whom, or under whose direction, such deer is wounded or killed shall within 12 hours report all the facts relative to such act to a fish and game warden. Such report shall state the time and place of such wounding or killing. A person who kills such deer shall immediately properly dress the carcass or carcasses and care for the meat. The fish and game warden shall immediately investigate the case and if he is satisfied that the deer was taken as herein provided, he shall give the person a certificate of his finding in the matter. Such certificate shall entitle such person to the ownership of the carcass or carcasses. Revised Statutes 1954, Chapter 37, Section 94.

Under the foregoing statute, if the respondent who had killed a deer in close time, seeks to justify his act, he must show by a preponderance of evidence that he owned or occupied the land on which the deer was killed, that "substantial damage" was being done by the deer to a fruit tree or a crop (except grass) *at the time.* If the respondent was not the owner or occupant of the land, he must show authorization as a member of the owner's or occupant's family, or an employee. The important thing is, what was the deer in the act of doing when killed. Was the deer in the garden doing "substantial damage," or was the deer out of the garden, or leaving the garden, when shot? If not in the act of doing substantial damage there is no justification. See *Chapman* v. *Decrow,* 93 Me. 378. A report within 12 hours to a game warden must also be made, and the carcass dressed, as the statute requires.

On appeal, the judgment of a lower court is vacated, and the case is removed to the Appellate Court and copy of record forwarded, and respondent is to be tried and judgment rendered *de novo* upon both law and fact. *Willett* v. *Clark*, 103 Me. 22; *State* v. *Houlehan*, 109 Me. 281, 284. Revised Statutes, 1954, Chapter 146, Section 23.

The exceptions taken by the respondent are stated in the bill of exceptions to be as follows:

1. "That the presiding justice erred in not sustaining the respondent's plea to the jurisdiction." There is no copy of the plea or any part of it in the bill of exceptions. A motion to dismiss was filed, according to the testimony, which was denied, but the bill is also barren of a copy of such a motion, and the grounds do not anywhere appear. If the motion to quash, for failure to forward briefs, is referred to, the bill does not so state. This exception does not comply with the rule and cannot be considered. Each ruling objected to must be clearly and separately set forth in the bill of exceptions. *Dodge* v. *Bardsley*, 132 Me. 231; *Bradford* v. *Davis*, 143 Me. 127.

2. Exception was taken to the ruling, that counsel "should confine his questions to facts in the case presently before the jury." This ruling was correct. The record shows that counsel was asking questions of a warden relative to other game cases that the warden had prosecuted or was a witness in. How far or how long counsel may proceed with a witness to test memory or to show lack of veracity, bias, prejudice, etc., is a matter of the court's discretion. We do not find that discretion was abused. *Grant* v. *Libby*, 71 Me. 427, 430; *Lancaster* v. *Water District*, 108 Me. 137; *State* v. *Smith*, 140 Me. 256.

3. This exception was to same effect as the preceding. The warden was being questioned as to his memory of what transpired at the hearing before the trial justice, and

whether or not he (the warden) conducted the examination of a certain witness. After pursuing this line of questioning for some time, the presiding justice thought he had "gone far enough." This was within the court's discretion.

4. Exception was taken to the refusal of the presiding justice to give the following instruction to the jury. "That the ordinary and usual meaning of the words used must be used in the interpretation; and that if any other special qualifying means are included, they should be specifically inserted in the statute involved. That in this instance the word 'employed' means employment of any person to do a specific act, and to shoot the deer would come under such a specific act, whether there was any remuneration or not. That the act of killing the deer must be proved as of a specific date and time of day."

This requested instruction was properly refused. It was only in part correct. The presiding justice had covered the subject in his charge. The words as given by the presiding justice were proper because the presiding justice left the matter of employment to the jury to find as a fact under the conflicting testimony as follows: "The intention of the legislature was that the man who owns or occupies may go and kill the deer if the deer is doing substantial damage at the time. Or, he may delegate one of his employees. I do not believe that the legislature intended that promiscuously owners or occupiers of orchards and crops on the land on which they grow, could likely call anybody in to kill deer for him. It calls for a relationship of members of his family or a relationship of employer and employee. It is for you to say whether or not there was a relationship of employer and employee between Mr. Hamilton and Mr. Whitehead." Later in his charge the presiding justice said, "The owner or occupant of the land, may authorize a person employed by him to take such deer, would include a person whom he employed for that particular work. Normally it would be

some person who worked for him, but he could employ somebody for that particular work."

The last portion of the requested instruction that the killing must be proved as of a specific date and time of day was left to the jury to determine, as a fact, because there was evidence of a specific day and time, but the evidence was conflicting.

The court is not bound to state a requested instruction in the words of the request in regard to anything properly covered in the charge as given. *State* v. *Cox*, 138 Me. 151; *State* v. *McKracken*, 141 Me. 194; *State* v. *Bean*, 146 Me. 328.

5. The fifth exception was not allowed by the presiding justice and counsel filed motion and took testimony to establish its truth. Without deciding whether or not the exception is established, we consider it, and say, if true, it is not ground for exception. It is stated in this claimed fifth exception that the presiding justice erred in not sustaining the motion to dismiss because the trial justice did not send to the Superior Court, as the Appellate Court, a copy of the process and all writing. The "writings" that were not forwarded were a brief of counsel as to the meaning of the word "employed." Briefs are not a part of the process. Briefs are ordinarily not "writings before the magistrate." They are not exhibits. They are not a part of the case or the record of the case. The brief or briefs here were certainly not apart. They were made to aid the trial justice in his determination of what the law was and what were the meanings of the words in the statute. Jurisdiction certainly does not depend on what the lawyer may say in his brief, unless the brief is a correct statement of the law, and is not merely a contention of what the law should be. Jurisdiction depends on what the law is. The fact that a brief in this case (prepared by respondent's counsel, submitted to the trial justice, and read by the trial justice before his de-

cision) was not forwarded by the trial justice to the Superior Court does not cause the Superior Court to lose jurisdiction, as is here claimed. If this were so, attorneys for respondents would make endless numbers of briefs in order that some might be "lost," and not forwarded to the Appellate Court.

6. The sixth exception was that the counsel for respondent, in cross examination of a state's witness, insisted on questioning him relative to the aforementioned brief or briefs, and respondent claimed some agreements with the warden relating thereto that respondent's guilt or innocence depended on the meaning of certain words. The court permitted the questions to test memory, but for no other purpose. The exception taken was not valid. It was within the court's discretion.

We have carefully examined this record, and we do not find any error. The respondent was represented by capable and experienced counsel, and all his rights were well protected. There were no exceptions taken to any refusal to direct a verdict. In fact, no motion to direct a verdict was made. There were no exceptions to any portions of the charge. In fact, the charge impartially and fully covered the conflicting claims. The jury could find under the evidence that the respondent killed three deer; that they were killed on the sixteenth day of September, 1954, before midnight, and that the respondent was (or was not) "employed." The employment might not be material in the jury's estimation, because there is little or no evidence to show what the deer, at the time when they were killed, were then doing. The jury would be justified in finding that the respondent did not sustain his burden to prove justification. We do not find that the jury verdict was "clearly wrong." We are, on the contrary, inclined to the belief that it was clearly right.

*Exceptions overruled.*