STATE OF MAINE
*vs.*
RALPH E. BENSON
AND
STEPHEN GREENLAW

Cumberland.    Opinion, May 22, 1959.

116

, *Arthur Chapman, Jr., County Attorney,*
*Clement F. Richardson, Asst. County Attorney,* for State.

*William Hutch,*
*Basil Latty,* for defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

DUBORD, J. These two respondents were indicted for assault and battery on one William Reagan, on August 3, 1957. They were tried together and found guilty by a jury. The presiding justice thereafter found that the offenses were of a high and aggravated nature.

The case is before us on exceptions by the respondents to certain portions of the charge of the presiding justice and to the refusal of the presiding justice to give a certain requested instruction to the jury.

It appears from the evidence that the respondents, accompanied by the wife of one of them, had frequented a number of places in the vicinity of Portland where intoxicating liquors in the form of beer and ale were dispensed. The respondents admitted having consumed some beer or ale, but contended the amount consumed was small in spite of the duration of the time they spent in the so-called beer parlors.

At the time of the assault, William A. Reagan, Jr., a Portland police officer, resided at 27 Anderson Street, in

the City of Portland. It appears that on another street running parallel to Anderson Street is Cleeve Street, and at number 27 on Cleeve Street there resided at the time in question one Marjorie McDonald, who plays a role of some interest in the drama which ensued.

The Reagans after listening to a rather well known television program, which concluded at 1:15 a.m. were preparing to retire. Mr. Reagan, who was suffering from some pain in one of his legs, was already undressed and in bed applying heat to his leg. Mrs. Reagan was in the act of disrobing. The Reagan children had long since gone to bed and were asleep.

Shortly after 1:15 on the morning of August 3, 1957, the Reagans heard a loud noise down stairs. Mrs. Reagan immediately put on her dress and started for the front hall. She put on the light and went down stairs where she was confronted by the respondent, Benson. Mrs. Reagan testified that she had bolted the door before preparing to retire for the night and that Benson had forced his way in by pushing the door with such force as to loosen the bolt. Upon inquiry as to the purpose of his presence, he said he was looking for Margie, whereupon she informed him there was no Margie on the premises, told him to leave and called her husband. Mr. Reagan came down promptly carrying his policemen's night stick or billy club. The evidence is somewhat confused as to just what ensued, but the Reagans testified that without further provocation, Benson struck Reagan violently in the mouth. As a result of this assault, Reagan struck back with his club. During the fracas the Reagans contend that they repeatedly asked Benson to withdraw and leave the house. However, he was very shortly joined by the other respondent, Greenlaw. One of the respondents, or both of them wrested the club from Reagan and he testified that Benson struck him with the club upon the head with such force as to break the club in

two pieces. The Reagans testified to other acts of physical violence upon Reagan. The latter was very seriously injured and was in the hospital for five days and had to remain away from his employment for twenty-three days.

The respondents gave the following explanation for their entrance into the Reagan home.

It seems, according to them, that they had concluded to go to Margie's home and by mistake instead of going to 27 Cleeve Street went to 27 Anderson Street. Both respondents testified, and they were supported by Mrs. Benson, that upon arriving at 27 Anderson Street, they could see a woman in the Reagan home on the second floor by the window. They said that the car window was rolled down and one of the respondents shouted to the woman, who must have been Mrs. Reagan, according to their story, "Is Margie here? Is Margie home?" To this the woman answered. "Margie? Oh, yes, just a minute. I will come down and let you in."

Then after being admitted by the woman, who was Mrs. Reagan, immediately Benson was attacked and Greenlaw went to his rescue.

In the light of all the evidence, the stories told by the respondents and by the wife of one of the respondents is so highly improbable and incredible as to be unworthy of belief. Certainly the jury was warranted in rejecting their story of how the episode began. It is also of importance to note as bearing upon their credibility that one of the respondents admitted a conviction of larceny and the other respondent admitted one or more convictions for larceny as well as convictions for two other very serious crimes.

Before the jury retired the respondents took exceptions to the following portions of the charge of the presiding justice:

"When one goes on the land of another without invitation or license he is there unlawfully as a trespasser and the owner may take reasonable measures to remove him. The first duty of the trespasser is to retreat to a lawful position."

"One who has an opportunity to withdraw and fails to avail himself of it is thereafter unlawfully where he has no business to be, and therefore cannot claim self defense."

These constitute the basis for the first two exceptions now before this court.

The respondents also requested the presiding justice to charge the jury as follows:

"If you find that there was any hostility on the part of a witness against the respondent then you may take that hostility into consideration in determining the credibility of that witness."

This request was refused and the refusal is the basis for the third exception now before us for determination.

In justification of their assault on Reagan, the respondents claimed self-defense.

"According to the first law of nature, that of self-preservation, a person unlawfully assaulted, when without fault, may stand his ground and repel force with force to the extent which to him seems reasonably necessary to protect himself from injury." 4 Am. Jur. § 38, page 147.

"The extent of the resistance or the force that may lawfully be used in the defense of the person must be governed by the violence and nature of the attack. Care must be exercised that the resistance does not exceed the bounds of mere defense, so as to become vindictive. Generally stated, the force that one may use in self-defense is that which reasonably appears necessary, in view of all the circumstances of the case, to prevent the impending injury." 4 Am. Jur. § 50, page 152.

> "One who, in acting in self-defense, uses force in excess of that which he is privileged to use, is liable for so much of the force used as is excessive, and the other person has the normal privilege of defending himself against the use or attempted use of excessive force." 4 Am. Jur. § 51, page 153.

So much for the general rules relating to self-defense. Now what of the law when trespassers are involved?

> "If a trespasser is assaulted, without a request to leave, or is assaulted when he is willing to leave peaceably, he is entitled to the right of self-defense in resisting an assault." 4 Am. Jur. § 43, page 149.

> "The right to use force, however slight, in ejecting a trespasser who has peaceably entered does not exist in the first instance; the owner or occupant of the premises must first request or notify the trespasser to depart before he will be justified in the use of force to compel him to leave. But if the trespasser uses actual force in gaining an entrance, a request to leave is not necessary nor is a request to leave necessary when such request would be useless, when it would be dangerous to make the request, or when substantial harm might be done before a request could effectively be made." 4 Am. Jur. § 74, page 166.

> "While the force that may be used in ejecting a trespasser depends on the circumstances surrounding each particular case, the rule that the force must be such as appears to be reasonable in the circumstances finds universal support. It must not exceed that which is correctly or reasonably believed to be necessary to terminate the intrusion. If greater force is used to put the trespasser off the premises, the defendant is liable for the assault by reason of the excess force employed, that is, for so much of the force as is excessive; and under such circumstances, the person being ejected may defend himself against the use or attempted use of excessive force." 4 Am. Jur. § 70, page 165.

In the instant case the jury could have found that the defendant Benson forced his way into the Reagan home, and that even though requested to leave, he became the aggressor by first striking Reagan.

The first instruction to which the respondents except was a correct statement of the law. If the respondents had desired elaboration of the law of self-defense, counsel should have requested the presiding justice to give additional instructions.

The respondents take nothing by their first exception.

As to the second instruction to which the respondents take exceptions, it would appear that this instruction was not, in the first instance, broad enough to explain to the jury that Reagan had no right to use more than reasonable force to eject Benson. However, the inadequacy of the instruction was corrected by the presiding justice after a conference at the bench and suggestion made that this particular issue should be clarified.

The respondents take nothing by their second exception.

As to respondents' third exception to the refusal of the presiding justice to instruct the jury that hostility on the part of a witness against the respondents could be taken into consideration in determining the credibility of that witness, the law seems to be clear that animosity of a witness towards a party may have a bearing on credibility. See 98 C. J. S. § 547, page 489.

> "A witness may be discredited by showing his bias, as by proving near relationship, sympathy, hostility or prejudice." 58 Am. Jur. § 706, page 382.

See also *State* v. *Salamone*, 131 Me. 101, 104; 159 A. 566. In this case the decision in *Motley Applt.* v. *State*, 207 Ala. 640, 93 So. 508, was cited with approval. In that case the court said:

"When a witness denies any feeling of hostility or unfriendliness towards the party against whom he has testified injuriously, it is the party's right to inquire, on cross examination, as to the existence of any fact, including previous relationship of course, which in the light of human experience might reasonably engender hostility towards the party, or affect the witness with partisan feeling, and thus impair the trustworthiness of his testimony."

In the instant case counsel for the respondents attempted to show hostility on the part of the Reagans to the respondents by reason of some trouble which had occurred sometime previous to the alleged assault, between Mrs. Reagan and some friend of Margie, or both Margie and her friend. It is to be noted that unlike the case of *Motley* v. *State,* neither of the Reagans were asked if they had any hostility towards either or both of the respondents. In our opinion, it was quite a farfetched theory to attempt to show or prove that the Reagans were hostile to the respondents because of any trouble which Mrs. Reagan might have had with Marjorie McDonald or her friend.

The law is well settled that the general principle is that instructions given by the trial court, whether as a part of its general charge or upon special request of counsel, should state the law as applicable to the particular facts in issue in the case at bar, which the evidence in the case tends to prove. Mere abstract propositions of law applicable to any case, or mere statements of law in general terms, even though correct, should not be given unless they are made applicable to the issues in the case at bar. See 53 Am. Jur. § 573, page 451. Moreover, the rule that instructions are to be confined to the issues, applies in criminal cases as well. See 53 Am. Jur. § 575, page 454.

See also, 23 C. J. S. § 1310, page 902; § 1311, page 904, and § 1312, page 906.

The foregoing principle that requested instructions should be based on some specific evidence in the case has been sustained in numerous opinions by this court.

> "Requests (for instructions) should be made applicable to the facts in evidence." *Brackett* v. *Brewer,* 71 Me. 478, 484.

See also, *Pillsbury* v. *Sweet,* 80 Me. 392, 394; 14 A. 742.

> "Moreover, requested instructions must be complete and correct in their entirety, - - - - - - as well as applicable to the facts proved." *Tower* v. *Haslam,* 84 Me. 86, 90; 24 A. 587.

See also *Mears* v. *Biddle,* 122 Me. 392, 395; 120 A. 181.

In *Illingworth* v. *Madden,* 135 Me. 159; 192 A. 273; it was held that it is not error to refuse to allow the jury to consider an impossible or impracticable theory which has no support in the evidence.

It is our opinion that the request upon which respondents' third exception is based was properly refused for the reason that it was not founded upon any evidence tending to prove the existence of hostility. In so finding, we are not unaware that the weight and sufficiency of the evidence to establish a fact in issue is a question for the jury.

> "However, in order to warrant giving an instruction, the evidence should be sufficient fairly to raise the question involved therein. No instruction should be given which is not reasonably supported by the evidence, or which is not based on some theory logically deducible from some portion of the evidence. Thus an instruction should not be given on evidence which at the most merely raises a possibility or a conjecture." 23 C. J. S. §1313, page 913.

We have read with great care the entire evidence in the case. We are satisfied that the jury must have been unfavorably impressed with the evidence offered by the re-

spondents. They related a story of riding around in an automobile after 1:15 in the morning, in search of a woman named Margie, the location of whose residence was in doubt and whose last name they did not even know. The reason for their attempted call on this woman at this unusual hour of the night was not given, nor is it of importance. The respondents suggested as their reason for a call at such an unreasonable hour the closeness of the friendship between them and this woman; and yet the evidence discloses that one of the respondents had never met Margie and that the acquaintance of the other respondent, Benson, and his wife, dated back only two weeks.

We are convinced that the respondents were not prejudiced by any of the instructions given to the jury, nor by the refusal to give the instruction pertaining to alleged hostility.

> "There are numerous cases in which it has been held a new trial will not be granted even if instructions are erroneous unless it appears also that they might have been prejudicial to the excepting party. *Russell v. Turner,* 59 Me. at 258, and cases there cited. Neither will a new trial be granted where there are erroneous rulings by the presiding justice on abstract principles of law not affecting the truth of the result." *Levine* v. *Reynolds,* 143 Me. 15, 19; 54 A. (2nd) 514.

> "Upon the law and legal evidence, whatever the errors in the rulings of the court, the result of the trial was evidently right. It would seem like trifling with the ends of judicial procedure to say that an erroneous ruling, which did not affect the truth of the result, should be regarded as a sufficient reason for the overturning of a fair and honest judgment. If the court erred, the jury did not. They were right." *Gordon* v. *Conley,* 107 Me. 286, 292; 78 A. 365.

As was said in *State* v. *Mann,* 143 Me. 305, 312; 61 A. (2nd) 786:

"We do not hesitate to say that the complete record bears convincing witness to a fair trial and a just verdict."

*Exceptions overruled.*
*Judgment for the State.*