STATE of Maine

v.

Romeo BROWN.

Supreme Judicial Court of Maine.

June 13, 1974.

William T. Hyde, Asst. County Atty., Skowhegan, for plaintiff.

Alan C. Sherman, Robert J. Ringer, Jr., Waterville, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

At the January term in 1973, a Somerset County jury convicted the Defendant of breaking, entering and larceny in the nighttime. Appellant seeks to raise four issues:

1. Whether the trial Justice erred in advising a prosecution witness during cross-examination that he could refuse to testify as to certain matters on the grounds that his testimony might tend to incriminate him?

2. Whether the Defendant was denied a fair trial in that he was prevented from conducting a complete cross-examination of a prosecution witness?

3. Whether the words "A True Bill" set forth in the indictment are so prejudicial as to deprive Defendant of a fair trial?

4. Whether the trial Justice's instruction relative to defense counsel's argument was correct as to the question of law involved and whether its effect was potentially prejudicial to Defendant?

The events giving rise to the subject trial concerned the unlawful acquisition and removal of blank checks from the Maple Lane Dairy in Madison, Maine on the night of November 29, 1972. The State's key witness was Robert Huard. His testimony was to the following effect. On the evening of the alleged larceny, he accompanied the Defendant Brown to the premises of the Maple Lane Dairy. Once there, Huard obtained entrance to the building by breaking a window and climbing in through it. He then opened a door which enabled Brown to enter. The office door was locked, so Huard forced it open. Once inside the office, the two men seized a checkbook from a desk drawer. Brown carried the checkbook back to his car and

placed it underneath the seat. The two men then drove back to Waterville.

On cross-examination, it was disclosed that Huard had signed an agreement with the County Attorney (not the present County Attorney on this appeal) in the presence of his lawyer. The agreement was the result of plea bargaining and provided for a reduction of the outstanding charge against Huard and a grant of transactional immunity to him in return for his making full disclosure of all matters of a criminal nature within his knowledge. The agreement provided in part:

Whereas said Robert C. Huard and his court appointed attorney, [name omitted], are desirous of entering into plea bargaining; and

Whereas in this regard the said [court appointed attorney] has approached the County Attorneys of Somerset and Kennebec counties; and

Whereas both County Attorneys' offices are desirous of entering into plea bargaining with said Robert C. Huard and his said counsel;

Be it agreed that in return for said Robert C. Huard's making a full disclosure of all matters of a criminal nature within his knowledge the charge of Breaking, Entering and Larceny in the Nighttime at the Maple Lane Dairy, Inc. of which he now stands charged will be dismissed and reduced to a misdemeanor charge of Concealing Stolen Goods and also the State promises the said Robert C. Huard complete and/or transactional immunity as to all other criminal activity now existing within the jurisdiction of the Maine Courts.

At trial, the witness acknowledged that it was his understanding that charges in connection with a *series* of breaks would be dropped in return for his agreeing to testify. The other charges related to

breaks at two auto agencies. The witness testified on cross-examination that checks were also stolen during these other breaks, though none were personally taken by him. He did admit, however, to cashing some of the checks stolen from these other breaks. He admitted to negotiating a check stolen from Roland's Auto Sales. At this point in the cross-examination, the trial Justice interrupted the questioning and advised the witness that he had the right to refuse to testify as to any crime in which he was previously involved that he had not already disclosed. When questioning resumed, defense counsel asked the witness to relate that happened when he negotiated the stolen Roland's Auto Sales check. The witness refused to answer on the grounds that to do so might tend to incriminate him. Objection by defense counsel to the claim of privilege was overruled.[1]

Further questioning related to the checks stolen from Maple Lane Dairy. The witness denied negotiating or attempting to negotiate any of those checks himself. He did admit that a female acquaintance was to negotiate some of the checks, and he was to share in their proceeds. To the witness' knowledge, none of the Maple Lane Dairy checks were successfully negotiated. When interrogation returned to the negotiation of the Roland's Auto Sales checks, the witness again invoked his privilege against self-incrimination.

The only questions which the witness, Robert Huard, refused to answer on the basis of his Fifth Amendment privilege against self-incrimination were those pertaining to the negotiation of checks taken in a separate and unrelated break at Roland's Auto Sales. Prior to considering the right of the witness to claim the privilege against responding to those particular questions, we consider the issue of the underlying legal relevancy of these particular questions on cross-examination.

■ All facts which tend to prove or disprove the matter at issue or which constitute a link in the chain of circumstantial evidence with respect to the act charged are relevant and should be admissible into evidence within judicial discretion unless excluded by some rule or principle of law. State v. Northup, Me., 318 A.2d 489 (1974); State v. Eaton, Me., 309 A.2d 334 (1974); State v. Norton, 151 Me. 178, 116 A.2d 635 (1955); State v. Hamilton, 149 Me. 218, 100 A.2d 234 (1953).

The disputed questions on cross-examination went to the involvement of the State's witness in a separate and unrelated crime, not involving the Defendant, and for which there was no subsequent prosecution by the State. The purpose of this line of questioning by defense counsel is directed at these objectives:

1. To impeach the witness' credibility by showing prior bad conduct on his part;

2. To impeach the witness' credibility by showing bias on his part.

■ Specific acts of bad conduct may not be inquired of upon cross-examination for the sole purpose of impugning the character of the witness so as to make his testimony unworthy of belief. Monroe Loan Soc. v. Owen, 142 Me. 69, 46 A.2d 410 (1946). Cf. State v. Flaherty, 128 Me. 141, 146 A. 7 (1929).[2]

■ Separate from such questioning for the purpose of proving bad character, however, is the use of specific prior acts for the purpose of showing bias in the testimony of a witness. Great latitude is allowed on cross-examination to show the special interests of an individual in testifying. Stetson v. Caverly, 133 Me. 217, 175 A. 473 (1935); Ross v. Reynolds, 112 Me. 223, 91 A. 952 (1914). This is especially

true where the witness claims to be an accomplice of the defendant. Sound judicial policy demands that defense counsel be given full opportunity to test an accomplice's veracity, motives, and relation to the crime, where his testimony is being offered by the state against the accused. 2 Wharton's Cr. Evidence (13th ed.), § 463; 3A Wigmore, Evidence (J. H. Chadbourn rev.), § 967. Bias may be shown by developing particular facts which are sufficient to provide an intelligent understanding of the witness' particular interest in the prosecution at hand and the resulting potential for partiality in his testimony.

■ The disputed issue which the defense counsel was attempting to explore on cross-examination was the extent to which, because of his agreement to testify against defendant, the witness was to be excused from prosecution for potentially indictable activity. The purpose of the questioning was not to discredit the character of the witness by specific acts of misconduct, thereby attempting to prove his general unreliability for truth and veracity. Rather, the extent of previous criminal activity was probed for the purpose of showing the extent of Huard's interest in cooperating with the prosecution so as to curry its favor and obtain leniency. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); State v. Mathis, 47 N.J. 455, 221 A.2d 529 (1966). Here the witness was testifying under what he believed to be a grant of transactional immunity and a dismissal of all potential criminal charges up to that date except for the misdemeanor to which he pleaded guilty. The fact of bargaining between the State and the witness relative to reduction of outstanding charges and protection from future prosecutions may be shown to indicate the potential bias of the witness. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.

2. A witness' credibility may be impeached by proof of criminal conviction of a felony, any larceny, or any other crime involving moral turpitude as permitted under 16 M.R. S.A. § 56. See State v. Toppi, Me., 275

A.2d 805 (1971). The questioning on cross-examination relative to the negotiation of checks stolen from Roland's Auto Sales did not concern an offense for which the witness had been convicted.

Ed. 2d 104 (1972). Furthermore, where an accomplice testifies against a defendant following a *deal* between the State and the witness, it is proper to allow cross-examination not only to the existence of the arrangement, but also to the extent of the benefit which the witness is likely to obtain as a result of his cooperating testimony. The interrogation on cross-examination was relevant to that end.

The extent to which counsel may cross-examine witnesses as to collateral issues for purposes of impeachment is left to the sound discretion of the trial justice. State v. Gervais, Me., 317 A.2d 796 (1974); State v. Biddison, 159 Me. 475, 195 A.2d 532 (1963); State v. Whitehead, 151 Me. 135, 116 A.2d 618 (1955); State v. Kimball, 50 Me. 409 (1861). While cross-examination of accomplices appearing for the State should be liberally permitted, the trial Justice is still invested with the discretion of determining the permissible scope of inquiry. In the subject case, the Court specifically allowed the questions of defense counsel and noted their relevancy to impeachment.[3] There was no objection entered by the State, and the Justice did not abuse his discretion in permitting the questions.

Despite the relevancy of the questions and the propriety of their being put to the witness, the Court sustained the Fifth Amendment privilege of the witness not to respond. Although evidence is admissible, it may still be privileged from answer. The trial Justice's advice to the witness that he could exercise his Fifth Amendment privilege against self-incrimination during cross-examination raises three subsidiary questions. First, whether it is the proper function of a presiding justice, on his own initiative, to inform a witness of his right not to answer questions that might incriminate him? Second, whether the privilege against self-incrimination may be exercised during cross-examination as to questions going to impeachment of the witness' testimony? Third, whether the Defendant's right to a fair trial is jeopardized by the witness' invocation of his Fifth Amendment privilege?

Although a trial judge is under no affirmative obligation to advise witnesses of their privilege against self-incrimination as a matter of ordinary course, it is appropriate for an attentive trial judge to give the warning where need appears. The trial Justice in this instance perceived a potential danger of incrimination to the witness from the cross-examination questions put to him. The witness was without counsel present, and it was within the discretionary authority of the presiding Justice to advise the witness, sua sponte, of any privilege available to him, if in fact such privilege was available to the witness. Commonwealth v. Slaney, 345 Mass. 135, 185 N.E. 2d 919 (1962). A party seeking to question a witness may not claim that the court prevented relevant questioning or intimidated witnesses into silence by virtue of the fact that the court advised such witnesses of their constitutional rights. United States ex rel. Robinson v. Zelker, 468 F.2d 159 (2nd Cir. 1972).

The important question concerning the right of the witness to assert his Fifth Amendment privilege on cross-examination, after already having testified on direct examination, is complicated by the written agreement executed between the

---

3. Upon upholding the witness' 5th Amendment privilege not to answer incriminating questions, the Court answered defense counsel's objection to the ruling by responding that the questioning for impeachment purposes could continue; it was to the answers only that the privilege extended.

You can ask him any questions you want. All I'm saying is, he has a right to refuse.

He can refuse to answer . . .
You can use this to impeach anything he says.
*See* Hinds v. John Hancock Mut. Life Ins. Co., 155 Me. 349, 155 A.2d 721 (1959); Gendron v. Burnham, 146 Me. 387, 82 A.2d 773 (1951).

witness and the County Attorney. The agreement suggests that the witness not only would receive transactional immunity for his testimony, but also would be immune from prosecution for all other criminal activity then existing within the jurisdiction of Maine courts.

If such a grant of immunity were an effective extension of protection from prosecution, the witness would have no legitimate basis for claiming a privilege against self-incrimination. The protective umbrella would eliminate any possibility that the witness' statements could provide evidence that could directly or derivatively be used against him in any future prosecution.

■ It is this concept of "immunity" that has given rise to the several state and federal immunity statutes. By granting a witness protection from prosecution to a degree coextensive in scope with the Fifth Amendment privilege, the prosecution may compel the witness to answer questions. Ullman v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

The Maine immunity statute is contained in 15 M.R.S.A. § 1314–A, and grants to the witness transactional immunity. This grant of immunity is more extensive than that required by the federal constitution, Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). As a constitutional exercise of the State prerogative in the disposition of criminal cases, 15 M.R.S.A. § 1314–A is an essential and effective aid in the enforcement of the criminal laws. State v. Vickers, Me., 309 A.2d 324 (1973).

In the subject case, the County Attorney did not comply with the procedural requirements necessary to compel evidence under § 1314–A. The statute requires that the prosecuting attorney request in writing, with the written approval of the Attorney General, that the court order the witness to answer questions or produce evidence. Furthermore, the court must provide the witness with notice and a hearing prior to granting such an order.

■ Any alternative attempt to grant immunity and compel testimony without complying with the requisite formalities of § 1314–A is without legal authority and is ineffective to the ends sought. There is no inherent authority within the office of a prosecuting attorney to grant immunity to a witness against self-incrimination. United States v. Ford, 99 U.S. 594, 25 L.Ed. 399 (1879); People v. Groves, 63 Cal.App. 709, 219 P. 1033 (1923) (dictum); State v. Roberts, 4 Conn.Cir. 271, 230 A.2d 239 (1967); Allers v. State, 144 Md. 75, 124 A. 399 (1923); Bowie v. State, 14 Md.App. 567, 287 A.2d 782 (1972); Apodaca v. Viramontes, 53 N.M. 514, 212 P.2d 425 (1949); Commonwealth v. Carrera, 424 Pa. 551, 227 A.2d 627 (1967); Re Werner, 46 R.I. 1, 124 A. 195 (1924); Temple v. Commonwealth, 75 Va. 892 (1881). 8 Wigmore, Evidence (McNaughton rev.), § 2281; Wharton's Criminal Law and Procedure (R. A. Anderson ed.), § 165; 4 Jones; Evidence, § 862.

■ The power to grant immunity from prosecution is not inherent in any officer of government; it may only be conferred by explicit statutory provision. This holding finds strong and almost universal support among authorities in this country. Then Chief Judge Cardozo, of the New York Court of Appeals, said in Doyle v. Hofstader, 257 N.Y. 244, 177 N.E. 489, 495 (1931):

The conclusion, we think, is inescapable that a power to suspend the criminal law by tender of immunity is not an implied or inherent incident of a power to investigate. It may be necessary for fruitful results in a particular instance, but it is not so generally indispensable as to attach itself automatically to the mere power to inquire. Whether the good to be attained by procuring the testimony

of criminals is greater or less than the evil to be wrought by exempting them forever from prosecution for their crimes is a question of high policy as to which the law-making department of the government is entitled to be heard.

The presiding Justice is the only authority sanctioned by statute to compel testimony by a grant of transactional immunity. The action of the County Attorney in "contracting" with the witness for complete immunity and protection from all criminal prosecutions within the State was outside of his statutory power and such binding promise was without legal effect. *See* State v. Johnson, 77 Wash.2d 423, 462 P.2d 933 (1969).

The trial Justice correctly concluded that the plea-bargained grant of immunity agreement between the witness and the State did not serve to protect adequately the witness from subsequent prosecution based on his testimony. The unwarranted offer of the County Attorney was not a lawful immunization coextensive with the Fifth Amendment privilege. The witness therefore properly retained the right to refrain from answering any questions which fell within the orbit of his Fifth Amendment privilege.

It is unnecessary for this Court to determine whether the testimony given by the witness, Huard, on direct examination was improperly induced by the purported grant of immunity or was the product of more generalized expectations based on plea bargaining with the County Attorney. We are not concerned here with the jeopardy, if any, that the witness might face in future prosecutions. The witness had neither voluntarily waived his privilege against self-incrimination nor had that privilege preserved for him by a proper grant of immunity. Possible restraints on future government prosecution were neither sufficiently certain nor adequately established in law to justify a removal of the witness'

right to invoke his privilege against answering incriminating questions.

Although the witness had already testified on direct examination, the privilege against self-incrimination could still be properly asserted on cross-examination as to collateral matters going only to impeachment of the witness' testimony. State v. Langley, Me., 242 A.2d 688 (1968); *see* State v. Wentworth, 65 Me. 234 (1875); *cf.* State v. Witham, 72 Me. 531 (1881). Direct testimony of a non-party witness, whether it be voluntary or induced, does not constitute a waiver of the testimonial privilege with respect to criminal acts relevant only to impeach the witness' credibility. 8 Wigmore, Evidence, (McNaughton rev.), § 2276. Robert Huard was acting within his constitutional safeguard when he refused to answer questions relative to the negotiation of checks stolen from Roland's Auto Sales. The minimal restrictions on the scope of cross-examination as to the collaterally relevant, but nonetheless privileged, subject matter did not prejudiciously impede the Defendant's right to confrontation. The issue of bias resulting from "dealing" between the prosecution and the witness was substantially explored on cross-examination. The inquiry was conditioned only by the constitutional right of the witness to refrain from discussing the specifics of prior criminal activity. *See* Davis v. Alaska, 415 U. S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Robbins, Me., 318 A.2d 51 (1974). The Defendant's constitutional right to confront and impeach the witnesses against him does not guarantee unrestricted admission into evidence of all material of an impeaching nature. *See* State v. Carey, Me., 290 A.2d 839 (1972). The constitutional rights of both the Defendant and the witness were preserved by the actions of the trial Justice.

We find no merit in Appellant's last two contentions. The Defendant maintains that the words "A True Bill,"

set forth at the bottom of the indictment and brought to the attention of the jurors in reading the indictment at the commencement of the trial, may be misconstrued so as to prejudice the Defendant before the jury.

It has been the settled tradition in Maine that the words "A True Bill" are the appropriate form of certification by which the foreman of a grand jury attests that the indictment was found by the concurrence of the requisite number of grand jurors. In Re Webster, 5 Me. 432 (1838). The absence of such words is no longer fatal to the indictment. Prior v. State, Me., 265 A.2d 486 (1970). The mere fact, however, that the tendency "to secure simplicity in procedure" (M.R.Crim.P., Rule 2) no longer mandates the inclusion of such words to assure the validity of the indictment does not suggest that the presence of such words is prejudicial to a defendant.

The jury was instructed that the Defendant was innocent until proven guilty beyond a reasonable doubt and that only "legal evidence" could be considered in their deliberations. It is safe to assume that reasonable jurors are aware of their unique and exclusive function in weighing the evidence produced before them and in determining from such evidence the guilt or innocence of the accused. The certification of the indictment in no way suggests, or allows misconception, that the facts alleged in the indictment are to be believed by the jurors. The words of endorsement do not go to the substance of the charge but only to the form in which it is presented. Frisbie v. United States, 157 U.S. 160, 164, 15 S.Ct. 586, 588, 39 L.Ed. 657 (1895).

The final issue concerns the instruction directed to that portion of defense counsel's argument that apparently made reference to the distinction between a felony and a misdemeanor. The content of the argument is not shown on this record and the purpose of such argument is unclear. Counsel failed to state distinctly the matter

to which he objected and *the grounds of his objection.* M.R.CrimP. Rule 30(b). The trial Justice, by clear and simple instruction, quite appropriately and correctly stated applicable law. There was no error.

 The court correctly refused the instruction requested by defense counsel that the distinction between felony and misdemeanor be defined. It is elemental that instructions are to be confined to the issues. State v. Benson and Greenlaw, 155 Me. 115, 122, 159 A.2d 266 (1959).

The entry shall be:

Appeal denied.

All Justices concurring.